# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                          No. CR 05-772 JB

DIONYSIUS FOX,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress, filed February 28, 2006 (Doc. 39)("Motion to Suppress").  The Court held a hearing on this motion on April 12, 2006.  The primary issues are: (i) whether Defendant Dionysius Fox has standing to contest the inventory search of the vehicle in which he was found; (ii) whether, if Fox has such standing, that inventory search violated the Fourth Amendment; (iii) whether the circumstances surrounding Fox's telephone call made while in detention violated his Sixth Amendment right to counsel; and (iv) whether Fox waived his Fifth Amendment right of silence under duress.  Because the Court finds that Fox does not have standing to assert the Fourth Amendment's prohibition against unreasonable search and seizure, that  Fox's Sixth Amendment right to counsel was not violated, and that Fox's statements were not made under duress in contravention of his Fifth Amendment right to remain silent, the Court will deny Fox's Motion to Suppress.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this

Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.    Fox gave Rosabelle Shepherd money to pay for the rental vehicle, which she rented in her name, because he did not have a credit card or a driver's license.  See Transcript of Evidentiary Hearing at 13:12-20 (Fox)(taken April 12, 2006)("Transcript"); id. at 14:3-14 (Fox); id. at 31:14-25 (Fox).[1]

2.    Fox did not read the rental agreement.  See id. at 16:17-17:14 (Fox).

3.    Fox excluded a female passenger from the vehicle after he and her had an argument. See id. at 18:13-19:2 (Fox).

4.    Fox knew the rental company would not rent the vehicle to him because he did not have a driver's license and a credit card.  See id. at 38:1-15 (Fox).

5.    Fox waited outside while Shepherd went into the rental company's office to rent the vehicle.  See id. at 36:14-37:25 (Fox).

6.    Shepherd drove the vehicle away from the rental company's property and for a couple

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

of additional blocks before Fox and Shepherd traded positions and he drove the vehicle.  See id. at 14:19-23 (Fox).

7.     Shepherd knew that there were limitations on who could drive the rental vehicle, but she did not communicate such to Fox.  See id. at 58:2-17 (Shepherd); id. at 59:4-6 (Shepherd).

8.     Shepherd did not know that Fox did not have a driver's license.  See id. at 61:1-6 (Shepherd).

9.     Shepherd  knew another driver was not authorized to drive the rental vehicle. See id. at 65:12-15 (Shepherd).

10.     Shepherd  and Fox had an agreement that he would not drink and drive the vehicle, and that, if he did, he no longer had authorization to drive it.  See id. at 67: 4-9 (Shepherd).

11.     On March 21, 2005, at approximately five o'clock in the morning, in Navajo, New Mexico, Navajo Police Officer Elroy Naswood, on routine patrol, approached a vehicle parked in a private driveway with its engine running.  See id. at 105:18-24 (Naswood); id. at 106:13-107:8 (Naswood).

12.     Once Naswood was upon the vehicle, he noticed that the man in the driver's seat, Fox, was unconscious and had an opened twelve-ounce bottle of beer between his legs.  See id. at 107:24-108:11 (Naswood).

13.     Naswood knocked on the driver's side window until Fox woke up, identified himself as a police officer, and asked Fox to exit the vehicle.  See id. at 108:19-110:4 (Naswood).

14.     As Fox stepped out of the vehicle, Naswood noticed that he was unsteady and that his breath smelled of alcohol.  See id. at 111:1-112:25 (Naswood); id. at 129:9-12 (Naswood).

15.     At that point, Naswood arrested Fox for driving under the influence ("DUI") and

placed him in the backseat of his patrol vehicle.  See id.

16.    Naswood asked Fox if the vehicle he had been asleep in was his and Fox replied that it was a rental.  See id. at 113:24-114:4 (Naswood); id. at 131:6-13 (Naswood); id. at 136:8-24 (Naswood).

17.    Naswood next conducted an inventory search of the vehicle.  See id. at 113:2-4 (Naswood); id. at 136:8-24 (Naswood).

18.    Naswood found an unopened twelve-ounce bottle of beer under the front passenger seat, a machete wrapped in a sweater in the backseat floorboard area, and a sawed-off, double-barrel shotgun and a rifle with an attached scope in the trunk.  See id. at 113:2-14 (Naswood).

19.    Naswood then went to the residence to which the driveway belonged and knocked on the door.  See id. at 115:6-8 (Naswood).

20.    Dushonia Calabaza answered the door, identified Fox as her brother, and stated that she had not known that the vehicle had been parked where it was, that the vehicle was a rental that Fox's aunt, Shepherd, had leased for one week, and that it would be alright to leave the vehicle parked where it was.  See id. at 115:10-116:5 (Naswood).

21.    Naswood gave Calabaza the keys to the vehicle and told her which items had been confiscated from the vehicle – the unopened bottle of beer, the machete, and the firearms.  See id.; Motion to Suppress at 2-3; Response to Defendant's Motion to Suppress at 2-3, filed March 20, 2006 (Doc. 43)("Response").

22.    While the Navajo police considered impounding the rental vehicle, it was not impounded nor was its impoundment attempted.  See Transcript at 117:3-18 (Naswood).

23.    The Navajo Nation has its own motor vehicle code.  See Navajo Nation Code tit. 14,

§§ 100-1703 (1988).

24.     Pursuant to Navajo Nation Code tit. 14 § 341(D), Navajo police officers should conduct a thorough inventory of property found in a vehicle upon the arrest of the person driving or in control of the vehicle.  See  Navajo Nation Code tit. 14, § 341 (1988).

25.     After speaking with Calabaza, Naswood drove Fox to the Window Rock Adult Detention Center.  See  id. at 117:18-120:2 (Naswood).

26.     Fox did not make any incriminating statements concerning the firearms to officers before FBI Special Agent Robert Sayegh interviewed him.  See id. at 26:11-15 (Fox).

27.     On March 23, 2005, Sayegh arrived at the detention center to interview Fox.  See id. at 160:12-18 (Sayegh).

28.     Fox told Sayegh that the corrections officers at the detention center had not let him make a telephone call yet.  See id. at 161:1-3 (Sayegh).

29.     Sayegh confirmed that they had not let Fox make a telephone call at the detention center and then provided a telephone to Fox so that he could make a call.  See id. at 161:3-17 (Sayegh).

30.     Fox called Calabaza at 9:35 a.m.  See id. at 161:17-20 (Sayegh); id. at 162:25-163:3; Government Hearing Exhibit 4, Report of Special Agent Robert Sayegh at 1 (dated March 28, 2005) ("Sayegh's Report").

31.     After Fox called Calabaza, Sayegh advised him of his constitutional rights at 9:45 a.m., and Fox signed a waiver of those rights at 9:46 a.m.  See Transcript at 163:1-3 (Sayegh); id. at 165:20-166:9 (Sayegh); Government Hearing Exhibit 1, Interrogation/Advise of Rights/Waiver of Rights Form at 1 (dated March 23, 2005)("Rights Form").

32.     Sayegh thus informed Fox of his constitutional rights after Fox made the telephone call. See Transcript at 162:25-163:3 (Sayegh); id. at 165:20-166:9 (Sayegh); Sayegh's Report at 1, Rights Form at 1.

33.     Fox was interviewed after he made his call, after he was advised of his constitutional rights, and after he waived his constitutional rights. See Transcript at 164:17-165:1 (Sayegh).

34.     Fox told Sayegh that he had rented the vehicle using his aunt's name and credit card, that he had been drinking alcohol the night before his arrest, that he had intended to use the firearms to go hunting, and that he had kept them in the trunk for safety reasons because there were children at Calabaza's house. See id. at 166:13-168:15 (Sayegh); Government Hearing Exhibit 2, Written Statement of Dionysius Fox at 1 (dated March 23, 2005)("Fox Written Statement"); Sayegh's Report at 3.

35.     Fox also told Sayegh that he had been injured while working in New York, that he had received a $700,000 settlement for his injuries, and that he purchased cocaine to help with his back pain whenever he could. See Sayegh's Report at 3.

36.     Following Sayegh's interview of Fox, Fox wrote a statement to include some of the things he had related to Sayegh. See Fox Written Statement at 1.

37.     In Fox's written statement, he reiterated that he had been informed of his constitutional rights, that he was willing to waive these rights, that no promises or threats had been made to him, and that no pressure or coercion had been used against him. See Fox Written Statement at 1; Transcript at 47:20-49:11 (Fox).

38.     Fox signed the written statement. See Fox Written Statement at 1.

39.     Sayegh did not require Fox to speak to investigators before he made a telephone call.

See Transcript at 161:1-162:25 (Sayegh).

40.    Sayegh did not ask Fox whether, if they allowed him to make a phone call, he would talk them.  See id. at 161:9-162:3 (Sayegh); id. at 163:13-25 (Sayegh); id. at 165:16-19 (Sayegh).

41.    Fox's statement was voluntary and not the result of coercion.  See id. at 47:20- 49:11 (Fox).

42.    Fox made his statement to Sayegh with a full understanding of his rights and without any coercion.  See id. at 28:12-20 (Fox); id. at 44:25-45:16 (Fox); id. at 47:20-49:11 (Fox).

43.    The Court does not find credible Fox's testimony that he believed all that was required for him to be authorized to drive the rental vehicle was Shepherd's permission, nor Fox's testimony that Sayegh promised Fox a telephone call in exchange for speaking with investigators.  See id. at 25:2-9 (Fox); id. at 26:17-25 (Fox); id. at 51:13-25 (Fox).

## PROCEDURAL BACKGROUND

Fox filed this motion, pursuant to the Fourth, Fifth, and Sixth Amendments of the United States Constitution, to suppress the evidence against him.  See Motion to Suppress at 1.  Fox contends that the Court should suppress the firearms, insofar as they may be used as evidence against him, because the vehicle in which they were found was not impounded and, therefore, Naswood had no legal justification to search its trunk.  See id. at 1, 4.  Fox also seeks to suppress as evidence against him all statements he made to Sayegh subsequent to his arrest.  See id. at 1, 7, 8.  Fox argues that the Court should suppress those statements, because they were obtained after his Fourth Amendment rights had been violated and are, therefore, "fruit of the poisonous tree," because they were made under circumstances that violated his Sixth Amendment right to counsel, and because they were made involuntarily in contravention of the Fifth Amendment.  Id.  Fox concedes that Naswood

had the right to check on the parked vehicle with its engine running in a private driveway per his community care taking function and that Naswood had the right to search the passenger compartment after he arrested Fox for DUI.  See id. at 4.  Fox requested that the Court hold an evidentiary hearing. See id. at 8.

### LAW REGARDING STANDING UNDER THE FOURTH AMENDMENT

"A district court cannot suppress evidence unless the movant proves that a search implicates Fourth Amendment interests."  United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995).  To determine whether a particular defendant has standing to invoke the Fourth Amendment's protections, it is necessary to consider whether that defendant manifested a subjective expectation of privacy in the area searched and whether society would recognize that expectation as objectively reasonable.  See Smith v. Maryland, 442 U.S. 735, 740 (1979); United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000).  "A Defendant has standing to challenge a search only if he or she ha[d] a reasonable expectation of privacy in the area being searched."  United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996).  To decide whether a reasonable expectation of privacy existed, the Court considers concepts of real or personal property law, keeping in mind that "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control."  Rakas v. Illinois, 439 U.S. 128, 143 & n.12 (1978).  While neither ownership nor lawful possession are determinative, they are often dispositive factors; a defendant seeking to establish standing bears the burden of demonstrating "that he gained possession from the owner or someone with the authority to grant possession."  United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

With respect to a defendant attempting to invoke the Fourth Amendment, who was in sole

possession and control of a car rented by a third party at the time of search, the United States Court

of Appeals for the Tenth Circuit has held that such a defendant does not have standing to challenge

search or seizure of the car.  See United States v. Jones, 44 F.3d 871 (citing United States v.

Obregon, 748 F.2d 1371, 1374-75 (10th Cir. 1984)).  In United States v. Obregon, the Tenth Circuit

included the following district court language in its holding:

> Defendant had the keys to the car and may have had permission from the renter of the
> car to use it, but this is not determinative of the standing inquiry in this case.
> Defendant was driving a rented vehicle and was not named on the rental agreement
> or any other documents, either as the renter or as an authorized driver.  Defendant
> made no showing that any arrangement had been made with the rental car company
> that would have allowed him to drive the car legitimately.  Indeed, the defendant
> testified that he waited outside of Miami airport while an unrelated third party
> arranged the rental of the car.  Defendant's relationship to the rented car is too
> attenuated to support a claim of standing.

748 F.2d at 1374.  See United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)(quoting the

same district court passage approvingly and relying on it to hold that a defendant, who it was

established at a hearing on a motion to suppress borrowed the rental car in question from the lessee,

his common-law wife, and who the rental car company had not authorized to drive the car,  had no

standing to invoke the Fourth Amendment).

## LAW REGARDING VEHICLE INVENTORY SEARCHES

The Fourth Amendment allows a police officer who has made a lawful custodial arrest of an

occupant or recent occupant of a vehicle to search the passenger compartment of that vehicle as a

contemporaneous incident of arrest.  See Thornton v. United States, 541 U.S. 615, 617, 623-24

(2004); New York v. Belton, 453 U.S. 454, 460 (1981).  A finding that an initial search of the

passenger compartment was justified, however, does not extend to an inventory search of a

defendant's car.  See United States v. Pappas, 735 F.2d 1232, 1243 (10th Cir. 1984).  An inventory

search is justifiable only if law enforcement has the authority to impound the vehicle in question and performs the search in accordance with explicit and comprehensive standardized procedures. See United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991). An inventory search undertaken pursuant to impoundment or the authority to impound "constitutes a well-defined exception to the warrant requirement." Illinois v. Lafayette, 462 U.S. 640, (1983). Discussing the relationship between probable cause and inventory searches in its opinion in United States v. Griffin, 729 F.2d 475 (7th Cir. 1984), the United States Court of Appeals for the Seventh Circuit stated:

> In applying the reasonableness standard adopted by the Framers, [the] Court has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents. Thus, the justification for an inventory search does not rest on probable cause and the absence of a warrant is immaterial to the reasonableness of the search.

729 F.2d at 481 (internal quotation marks and citations omitted)(quoting Illinois v. Lafayette, 462 U.S. 640, 643 (1983)). To determine the reasonableness of an inventory search a court must balance the search's intrusion on the Fourth Amendment right of the individual against legitimate government interests, such as, protecting the owner's property while it remains in police custody, protecting the police against claims or disputes over lost or stolen property, and protecting the police from potential danger. See South Dakota v. Opperman, 428 U.S. 364, 369 (1976); United States v. Griffin, 729 F.2d at 483. Finally, where a vehicle is parked on private property and a person is available to take custody of it, there is generally no need for impoundment, and, thus, no justification for an inventory search. See United States v. Pappas, 735 F.2d at 1243.

## LAW REGARDING VIOLATION OF
## THE SIXTH AMENDMENT RIGHT TO COUNSEL

The Supreme Court of the United States has held that the right of an accused person to

consult an attorney of his choosing attaches "when the process shifts from investigatory to accusatory." Escobedo v. Illinois, 378 U.S. 478, 492 (1964).  The Sixth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated -- "whether by formal charge, preliminary hearing, indictment, information, or arraignment." Kirby v. Illinois, 406 U.S. 682, 688-89 (1972).  In so holding, the Supreme Court explained:

> The initiation of judicial criminal proceedings is far from a mere formalism.  It is the starting point of our whole system of adversary criminal justice.  For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified.  It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.  It is this point, therefore, that marks the commencement of the criminal prosecutions to which alone the explicit guarantees of the Sixth Amendment are applicable.

See id. at 689-90.

With regard to a defendant's implied Sixth Amendment right to place a telephone call, that right  only attaches once the Sixth Amendment right to counsel attaches – when adversary judicial proceedings have been initiated.  In Rodgers v. Lincoln Towing Service, Inc., 771 F.2d 194 (7th Cir. 1985), the Seventh Circuit held that the defendant's right to counsel did not attach during the ten and a half hours he was held in detention before being formally charged and that, "[w]ithout the right to have counsel present, [the defendant] had no Sixth Amendment right to place a telephone call, be it to an attorney or family members." Id. at 199.  Similarly, in Strandberg v. City of Helena, 791 F.2d 744 (9th Cir. 1986), the United States Court of Appeals for the Ninth Circuit ruled:

> In this case the [defendant] had not yet been charged. . . . [While] the [defendant] waited for formal charges, no critical stage of prosecution was implicated which constitutionally required counsel be present.  Because he had no right to have counsel present, the [defendant] had no sixth amendment right to place a telephone call to his attorney.

Id. at 747 (citing Rodgers v. Lincoln Towing Serv., Inc., 771 F.2d at 199).

## LAW REGARDING VIOLATION OF
## THE FIFTH AMENDMENT RIGHT OF SILENCE

In determining whether a defendant's statements were made involuntarily in contravention of the Fifth Amendment right to remain silent, courts consider "whether, under the totality of the circumstances, the challenged [statement] was obtained in a manner compatible with the requirements of the Constitution." United States v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir. 1993). "An inculpatory statement is voluntary only when it is the product of rational intellect and free will." United States v. Leon Guerrero, 847 F.2d 1363, 1365 (9th Cir. 1988)(citing Blackburn v. Alabama, 361 U.S. 199, 208 (1960)). A court must consider, based upon the totality of the circumstances, whether the "government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Leon Guerrero, 847 F.2d at 1366 (citing Haynes v. Washington, 373 U.S. 503, 513-14 (1963)). A statement is involuntary when it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." Hutto v. Ross, 429 U.S. 28, 30 (1976)(quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). See United States v. Bautista-Avila, 6 F.3d at 1364 (quoting Bram v. United States, 168 U.S. at 542-43); United States v. Leon Guerrero, 847 F.2d at 1366 (same). That broadly stated rule, however, has not been applied to invalidate, per se, all of a defendant's statements made in response to a law enforcement officer's promise; the promise "must be sufficiently compelling to overbear the [defendant's] will in light of all the attendant circumstances." United States v. Leon Guerrero, 847 F.2d at 1366 ("Causation, including but-for causation, has never been the test for voluntariness. If the test was whether a

statement would have been made but for law enforcement conduct, virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action.").

In United States v. Gillaum, 373 F.3d 848 (7th Cir. 2004), the Seventh Circuit considered a defendant's claim that his statements had been made involuntarily.  The Gillaum court stated that the following factors are relevant in determining whether law enforcement conduct is coercive: "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep."  Id. at 856-57.  The defendant in United States v. Gillaum challenged the voluntariness of his statements based upon what he claimed were coercive interview conditions – an early morning arrest and interrogation, initial interrogation in a small bathroom, his diabetic condition, and statements by law enforcement officers that he would be better off providing information and that his wife would be taken into custody if he did not cooperate.  See id. at 856.  The Seventh Circuit held the defendant's statements voluntary, reasoning, based upon the factors they articulated in that case, that:

> [The defendant] was thirty-seven at the time of his arrest, and from past arrests was personally familiar with the criminal justice system.  He was read the Miranda warnings and was asked whether he understood the warnings.  [The defendant] told [a law enforcement officer] he understood the warnings, and told [the officer] that he had been arrested on five or six previous occasions and had the warnings read to him.
>
> * * * *
>
> Additionally, ... [the defendant] was coherent and did not appear to be under the influence of drugs or alcohol.  [The law enforcement officer present at the interrogation] also testified (and [the defendant] does not dispute) that he did not use physical force or yell at [the defendant].

Id. at 857.

-13-

## ANALYSIS

The Court finds that Fox lacks standing to assert the Fourth Amendment's protections against unreasonable search and seizure, and, therefore, that it need not determine the constitutionality of Naswood's inventory search.[2]  The Court also finds that Fox's Sixth Amendment right to counsel was not violated because of the delay in his being allowed to make a telephone call, and that Fox's Fifth Amendment right of silence was not violated because his statements were made voluntarily.  As such, the Court will not suppress the firearms evidence and inculpatory statements.

## I.  FOX DOES NOT HAVE STANDING TO CHALLENGE THE SEARCH UNDER THE FOURTH AMENDMENT.

Fox lacks standing under the Fourth Amendment, because he has not manifested a subjective expectation of privacy in the rental vehicle that society is prepared to recognize as objectively reasonable.  Fox did not gain possession of the vehicle from its registered owner, the rental car company, and Fox has not advanced evidence showing that he reasonably believed Shepherd was someone with the authority to grant possession.  While Fox testified at the evidentiary hearing that he thought the permission he received from Shepherd to drive the vehicle was all that was required, see Transcript at 16:17-25 (Fox), he also testified that he knew the rental company would not rent the vehicle to him, because he did not have a driver's license and a credit card, see id. at 37:25-38:1-

---

[2] In so deciding, the Court is mindful of the long-established principle that counsels courts not to "anticipate a question of constitutional law in advance of the necessity of deciding it," not to "decide questions of a constitutional nature unless absolutely necessary to a decision of the case," and not to "pass upon a constitutional question although presented by the record, if there is also present some other ground upon which the case may be disposed of."  Aswander v. Tennessee Valley Auth., 297 U.S. 288, 346-47 (1936)(Brandeis, J. concurring).  The Court will not determine the constitutionality of the search and need not here examine the applicability of the inevitable discovery doctrine.  See Nix v. Williams, 467 U.S. 431, 444 (1984); United States v. Ibarra, 955 F.2d 1405, 1409 (10th Cir. 1992).

15 (Fox).  Presumably, if Fox knew that the rental company would not rent the vehicle to him, he should have reasonably understood that, lacking a driver's license, it would not authorize him to drive the vehicle.  Moreover, when combined with Fox's testimony that he waited outside of the rental company's office while Shepherd went inside to rent the vehicle and that she drove the vehicle away from the rental company's property and for a couple of additional blocks before turning it over to Fox, see id. at 14:19-23 (Fox); id. at 36:14-37:25 (Fox), the Court does not find credible or objectively reasonable Fox's assertion that he believed that Shepherd had the authority to grant him possession of the vehicle.  Indeed, the Court finds the circumstances present in this case to be akin to those present in United States v. Obregon.  There, the Tenth Circuit ruled that the defendant was without standing to bring a Fourth Amendment challenge, because, while the defendant may have had the keys to the vehicle and permission from the renter of the vehicle to drive it, the defendant was not named on the rental agreement as the lessee or as an authorized driver, the defendant made no showing that an arrangement had been made with the rental company to allow him to drive the vehicle legitimately, and the defendant waited outside an airport while a third party arranged to rent the vehicle.  See id. 748 F.2d at 1374; United States v. Roper, 918 F.2d at 886-87.

At the evidentiary hearing, Fox's counsel made much of Fox's allegation, based upon United States v. Arango, that he had excluded a female passenger from the rental vehicle.  See id. at 912 F.2d 445 ("One of the main rights attaching to property is the right to exclude others . . . and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.")(quoting Rakas v. Illinois, 439 U.S. at 143); Transcript at 5:7-22 (Finzel); id. at 18:13-19:2 (Finzel).  Such a demonstration of the right to exclude, however, does not make up for Fox's inability to show that he gained possession of the rental vehicle

from the rental company or someone with the authority to grant possession.  See United States v. Arango, 912 F.2d at 445 ("[T]he proponent [of standing] must at least [show] that he gained possession from the owner or someone with the authority to grant possession.").

At the hearing, Fox's counsel also pressed the Court to find that Fox has Fourth Amendment standing based on the Tenth Circuit's decision in United States v. Hocker, 333 F.3d 1206 (10th Cir. 2003).  See Transcript at 4:14-20 (Finzel); id. at 5:23-6:18 (Finzel).  The Court believes, however, that Fox's case is distinguishable from Hocker.  The Hocker court held that a defendant had standing to contest a search under the Fourth Amendment even though he did not gain possession from the owner of someone with the authority to grant possession, because the defendant made a showing that he reasonably believed that the grantor was someone with the authority to grant possession.  See United States v. Hocker, 333 F.3d at 1209-11.  In United States v. Hocker, what persuaded the Tenth Circuit to rule that the defendant had standing was the defendant's demonstration that he believed the grantor of the vehicle was the owner or someone soon to become the formal owner, and that during his interactions with the grantor she had openly used the vehicle as her own and kept it at her home address.  See id.  Fox has made no such showing.  Fox has not alleged that he believed or had reason to believe that Shepherd was the lawful owner of the vehicle in question.  Rather, quite to the contrary, Fox knew that the vehicle was a rental and that the rental car company would not have granted him permission to drive it as he possessed neither a driver's license nor a credit card.  See supra at 12.

Based on the foregoing, the Court finds that Fox does not have standing to assert the Fourth Amendment's protections and, therefore, that it should not suppress the firearms evidence.  Further, because Fox lacks standing to challenge the search, the Court will not suppress his subsequent

statements to investigators under the theory that they are the fruit of the poisonous tree – the end result of an illegal search – per <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963).

## II.    FOX'S SIXTH AMENDMENT RIGHT TO COUNSEL WAS NOT VIOLATED.

The decision of the Window Rock Adult Detention Center's corrections officers' not to allow Fox to make a telephone call did not violate his Sixth Amendment right to counsel.  The right to make a telephone call does not attach until the right to counsel does.  <u>See</u> <u>Strandberg v. City of Helena</u>, 791 F.2d at 747; <u>Rodgers v. Lincoln Towing Serv., Inc.</u>, 771 F.2d at 199.   The right to have counsel present, in turn, does not attach until adversary judicial proceedings have been initiated – "whether by formal charge, preliminary hearing, indictment, information, or arraignment." <u>Kirby v. Illinois</u>, 406 U.S. at 688-89.  Fox does not allege nor does the record reflect that, at the time he was allowed to place a telephone call, he had been formally charged, indicted, arraigned, or brought before an officer of the court.   Thus, while Fox was not given the opportunity to make a telephone call for approximately two days, he was actually allowed to make one before his right to counsel attached. Thus, the delay that Fox experienced in being given an opportunity to place a telephone call did not violate his right to counsel under the Sixth Amendment.  Moreover, considering that Fox called his sister when given the opportunity to use a telephone, the Court finds unavailing Fox's counsel's speculation that Fox being allowed to place a telephone call earlier might have resulted in him getting advice from an attorney before waiving his right of silence.  <u>See</u> Motion to Suppress at 7.

## III.    FOX'S FIFTH AMENDMENT RIGHT OF SILENCE WAS NOT VIOLATED.

The Court does not believe that Fox's statements to Sayegh were made involuntarily in violation of Fox's Fifth Amendment right to remain silent.  Fox alleges that he made an agreement with Sayegh to make a telephone call in exchange for a statement – that he agreed to waive his

Miranda rights if allowed to make a telephone call. See Motion to Suppress at 6-7; Transcript at 25:3-9 (Fox). The Court, however, finds credible Sayegh's testimony recounting the events that took place during his meeting with Fox. Sayegh testified that he got Fox a telephone with which to make a call upon learning from Fox that he had not yet been given the opportunity to make one, that he made no suggestions to Fox that he would allow Fox to place a telephone call in exchange for Fox making statements to law enforcement, that he did not at anytime believe that there was a quid pro quo or a tacit agreement between himself and Fox, and that no promises or any coercion were used to elicit statements from Fox. See Transcript at 161:9-162:3 (Sayegh); id. at 163:13-25 (Sayegh); id. at 164:3-24 (Sayegh); id. at 165:16-19 (Sayegh).

Moreover, Sayegh's testimony, when combined with an assessment of the factors enunciated in United States v. Gillaum, see 373 F.3d at 856-57, strongly supports a determination that Fox's statements were made voluntarily. At the time of Fox's interview, Fox was thirty-five years of age, see Sayegh's Report at 1, coherent, had been detained for approximately two days, was not subjected to physical punishment, was personally familiar with the criminal justice system from his past arrests, was advised of his constitutional rights, was asked if he understood them, and stated that he did. See Transcript at 28:12-20 (Fox); id. at 44:1-45:25 (Fox); id. at 160:12-15 (Sayegh); id. at 164:1-165:18 (Sayegh). In addition, Fox does not allege that he was deprived of food or sleep during his detention before the interview, that Fox's intelligence level would make him susceptible to manipulation, or that Fox was under the influence of drugs or alcohol when he made his statements to law enforcement.

Furthermore, Fox made his inculpatory statements after he had made his telephone call, not before. See Transcript at 42:1-25 (Fox); id. at 43:13-17 (Fox). Second, between the time that Fox placed his call and made his incriminating statements, he was advised of and waived his Miranda

-18-

rights, which he testified at the evidentiary hearing he knew and understood.  See Transcript at 43:13-17 (Fox); id. at 44:1-45:25 (Fox).  Finally, under his own Fox testified that he made his statements to Sayegh out of a sense of his own personal morality, not because he felt pressured or coerced, and admitted that he signed his written statement acknowledging that no promises or threats had been made to against him and no pressure or coercion had been used against him in making the statement.  See id. at 47:20-49:11 (Fox).  Under the totality of the circumstances, the Court concludes that these circumstances were not sufficient to overbear Fox's will and rationality.  See United States v. Leon Guerrero, 847 F.2d 1365, 1366.

Consideration of the above leads the Court to find that Fox's statements were made voluntarily and not in violation of his Fifth Amendment right of silence.

Fox has not demonstrated that he has standing to assert the Fourth Amendment's prohibition against unreasonable search and seizure in these circumstances, that his Sixth Amendment right to counsel was violated, or that his Fifth Amendment right to remain silent was contravened.  The Court will therefore deny his motion to suppress.

**IT IS ORDERED** that Defendant's Motion to Suppress is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

David C. Iglesias
    United States Attorney for the
       District of New Mexico
Louis E. Valencia
    Deputy Supervisor
    Assistant United States Attorney for the
       District of New Mexico
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Roger A. Finzel
    Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

    *Attorney for the Defendant*